UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

UNITED STATES OF AMERICA,       :

     - v. -                :

ARNOLD MAURICE BENGIS,       :
JEFFREY NOLL,
GRANT BERMAN,              :
DAVID BENGIS, and
SHAUN LEVY,               :

               Defendants.   :

------------------------------------x

**FILED UNDER SEAL**

**INDICTMENT**

S1 03 Crim. 308 (LAK)

## COUNT ONE

**(Conspiracy to Violate the Lacey Act and to Commit Smuggling)**

The Grand Jury charges:

### Relevant Persons and Entities

At all times relevant to this Indictment:

1.   Hout Bay Fishing Industries (PTY) Ltd ("Hout Bay") was duly incorporated under the company laws of the Republic of South Africa, and its headquarters were located at East Pier, Table Bay Harbour, Cape Town, South Africa.

2.   Hout Bay was involved in the business of harvesting, purchasing, processing, marketing, selling, and exporting fish from South Africa, including, but not limited to, South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish.  South Coast rock lobster and West Coast rock lobster are species of fish native to the territorial waters of the



Republic of South Africa.  South Coast rock lobster typically is harvested by large sea-going vessels in deep ocean waters, often in areas between 24 and 60 miles from the South African coast. West Coast rock lobster typically is harvested by smaller vessels close to the shore of South Africa.  Patagonian toothfish is fished by large, sea-going vessels, in deep waters distant from shore.  Patagonian toothfish is commonly marketed in the United States as Chilean seabass.

3.    Icebrand Seafoods, Inc. ("Icebrand"), and Associated Sea Fisheries Inc. ("Associated") were duly incorporated under the laws of the State of New York and registered to do business there.  At all relevant times, Icebrand and Associated had their principal place of business in New York, New York ("the New York Office"), and were affiliated with each other and with Hout Bay.

4.    Icebrand and/or Associated were involved in, among other things, the business of importing fish into the United States on behalf of Hout Bay and the marketing and distribution of those fish to purchasers in Manhattan and elsewhere.  At all relevant times, Icebrand and/or Associated imported into the United States from South Africa quantities of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish shipped from Hout Bay.

5.   At certain relevant times, Icebrand Seafoods Maine Inc. ("Icebrand Maine") was duly incorporated under the laws of the State of Maine with its principal place of business in Portland, Maine ("the Maine facility").  Icebrand Maine was affiliated with Hout Bay.

6.   Icebrand Maine was involved in, among other things, processing and selling fish, including quantities of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish shipped from Hout Bay in South Africa and imported by Icebrand and/or Associated in Manhattan.

7.   ARNOLD MAURICE BENGIS ("BENGIS"), the defendant, was the Managing Director and Chairman of Hout Bay.  BENGIS exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, having control over Hout Bay's fishing activities and finances, and negotiating with Hout Bay's suppliers and customers and with South African regulatory authorities.  BENGIS also was an executive at Icebrand.  BENGIS exercised control over the affairs of Icebrand and Associated by, among other things, supervising Icebrand and Associated's personnel, having control over Icebrand and Associated's finances, and directing Icebrand and Associated's importation of fish into the United States and the marketing and distribution of those fish to Manhattan and elsewhere within the

-3-

United States.  BENGIS worked out of, among other places, an office at Hout Bay's facility in South Africa and an office at Icebrand and Associated's New York Office.

8.   JEFFREY NOLL, the defendant, was the Chairman and President of both Associated and Icebrand.  At all relevant times, NOLL exercised control over the affairs of Icebrand and Associated by, among other things, supervising personnel, having control over finances, and directing Icebrand and Associated's importation of fish into the United States, and the marketing and distribution of those fish to Manhattan and elsewhere within the United States.  At all relevant times, NOLL exercised control over the affairs of Hout Bay by, among other things, supervising personnel, having control over finances, and arranging for shipments of fish to be made from Hout Bay to the United States.  At all relevant times, NOLL had an office at Icebrand and Associated's office in New York, New York.

9.   At certain times relevant to this Indictment, GRANT BERMAN, the defendant, was the Financial Manager of Hout Bay in South Africa, and at other times relevant to this Indictment, was a sales manager for Icebrand and Associated in the New York Office.  BERMAN exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, having control over Hout Bay's fishing activities and

-4-



finances, and negotiating with Hout Bay's suppliers and customers.  BERMAN also exercised control over the affairs of Icebrand and Associated by, among other things, supervising Icebrand and Associated's personnel, having control over Icebrand and Associated's finances, and directing Icebrand and Associated's importation of fish into the United States and the marketing and distribution of those fish to Manhattan and elsewhere within the United States.  BERMAN worked from, among other places, an office at Hout Bay's facility in South Africa and, at certain other times, an office at Icebrand and Associated's New York Office.

        10.  At certain times relevant to this Indictment, DAVID BENGIS, the defendant, was the President of Icebrand Maine. DAVID BENGIS is the son of ARNOLD MAURICE BENGIS, the defendant, and exercised control over the affairs of Icebrand Maine by, among other things, supervising Icebrand Maine's personnel, having control over Icebrand Maine's finances, and negotiating with Icebrand Maine's customers.  DAVID BENGIS also exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, and directing Hout Bay operations at times when ARNOLD BENGIS was unavailable.

11.   At certain times relevant to this Indictment, SHAUN LEVY, the defendant, served as the export and factory production manager of Hout Bay.

12.   At all times relevant to this Indictment, Collin Ernst Hendrik van Schalkwyk ("Van Schalkwyk"), a co-conspirator not named as a defendant herein, was a director of Hout Bay and acted as its operational director.  At all relevant times, Van Schalkwyk exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, having control over Hout Bay's fishing activities and finances, and negotiating with Hout Bay's suppliers and customers and with South African regulatory authorities.

### Overview Of The Scheme

13.   Since at least in or about 1987, up to and including on or about August 1, 2001, ARNOLD MAURICE BENGIS, JEFFREY NOLL, GRANT BERMAN, DAVID BENGIS, and SHAUN LEVY, the defendants, Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as a defendant herein, and their co-conspirators, engaged in an elaborate scheme to illegally harvest large quantities of South Coast rock lobster, West Coast rock lobster and Patagonian toothfish and export that illegal fish from South Africa to the United States.  As part of the scheme, the defendants and their co-conspirators, among other things:

-6-

(i) harvested and caused others to harvest quantities of South Coast rock lobster and West Coast rock lobster far in excess of applicable quotas, (ii) illegally harvested, possessed, processed and exported to the United States large quantities of Patagonian toothfish, (iii) misreported the actual amounts of fish harvested to South African authorities, (iv) bribed South African fisheries inspectors to induce them not to enforce South African fisheries laws and regulations, (v) submitted false export documentation to South African authorities, thereby concealing their over-harvesting activities, (vi) submitted false documentation to United States Customs authorities, concealing their efforts to import into the United States illegal South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish and (vii) from time to time, processed illegally imported fish in the United States employing South African nationals who did not have proper authorization to work in the United States.

14.   In or about the end of May 2001, South African authorities seized and opened a container of illegally-harvested, possessed, and processed fish that ARNOLD MAURICE BENGIS, JEFFREY NOLL, GRANT BERMAN, DAVID BENGIS, and SHAUN LEVY, the defendants, Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as a defendant herein, and their co-conspirators, were seeking to export to the United States.  Following that seizure, in an

effort to conceal and perpetuate the scheme, the defendants and their co-conspirators engaged in a series of elaborate deceptions, designed to avoid detection and perpetuate the scheme. Among other things, the defendants and their co-conspirators: (i) worked to alter documents indicating the actual quantity of seafood harvested by fishing vessels, (ii) destroyed other documents evidencing the actual quantities of seafood harvested, (iii) removed large quantities of rock lobster from Hout Bay's storage facility in Cape Town, South Africa and hid that rock lobster in a vessel, in order to avoid seizure by South African authorities, (iv) moved large quantities of rock lobster from a storage warehouse in Newark, New Jersey, to Massachusetts, and (v) diverted an illegal shipment from its intended destination of New York, New York to Singapore and Hong Kong, to avoid seizure by United States authorities.

### The Regulatory Background

15. At all times relevant to this Indictment, the harvesting, processing, and exportation from South Africa of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish were regulated by several provisions of South African law and international convention.

16. At all times relevant to this Indictment, the harvesting, processing, and exportation of South Coast rock

lobster, West Coast rock lobster, and Patagonian toothfish were governed in part by the Marine Living Resources Act of South Africa (Act No. 18 of 1998) ("Marine Act") and the regulations promulgated under that Act.  The Marine Act and its regulations include, among other provisions, the following:

      a.   Sections 13 and 58 of the Marine Act, which, among other things, make it an offense to harvest or process fish without a permit.

      b.   Regulation 27(1)(c) under the Marine Act, which, among other things, makes it an offense, without authority of a permit, to transship (that is, transfer cargo between ships) or transfer at sea any fish from a fishing vessel or person to another fishing vessel or person.

      c.   Regulation 27(1)(f) under the Marine Act, which, among other things, makes it an offense to export from South Africa, any fish without a permit.

      d.   Regulation 44(1)(a) under the Marine Act, which, among other things, makes it an offense to fish, collect, keep, control, store, transport or possess any rock lobster, except on authority of a permit.

      e.   Regulation 54 under the Marine Act, which, among other things, makes it an offense, without a permit, to fish, collect, land, sell, or possess certain identified

-9-



prohibited species.  Patagonian toothfish, among other fish, is identified as one of the prohibited deepwater species.

f.  Regulation 85(2) under the Marine Act, which, among other things, makes it an offense to transship any fish or fish products from or to a vessel, without the supervision of a fishery control officer or other authorized person.

17.  At all times relevant to this Indictment, the harvesting, processing, and exportation of South Coast rock lobster and West Coast Rock lobster were regulated in South Africa by the South African Department of Marine and Coastal Management and its various predecessor organizations (collectively, "MCM").  MCM sought to protect the South Coast rock lobster and West Coast rock lobster species by, among other things:

a.  Establishing industry-wide limits on the total quantity of South Coast rock lobster and West Coast rock lobster that may be caught during a particular fishing season.

b.  Establishing quotas limiting the quantity of South Coast rock lobster and West Coast rock lobster that a quota holder (such as Hout Bay and its competitors in South Africa) would be allowed to harvest during a particular season.  Under MCM practice, a quota holder from time to time was permitted to assign its quota to a second entity, which allowed the second



entity to increase the total quantity of rock lobster it was allowed to catch under MCM's quota system.

    c.   Issuing permits to harvest South Coast rock lobster or West Coast rock lobster to the operators of particular vessels that were owned or operated by quota-owners or their assignees.

    d.   Observing the off-loading of South Coast rock lobster and West Coast rock lobster catches, and keeping track of quantities harvested and off-loaded by particular fishing vessels, in order to assure that the fishing companies did not harvest more rock lobster than was permitted under applicable quotas.

    e.   Issuing permits to export South Coast rock lobster and West Coast rock lobster, and keeping track of the particular quantities of rock lobster harvested, in order to assure that the fishing companies did not export more rock lobster than they (and others fishing for them) were permitted to harvest under the applicable quotas.

    18.   The exportation of commodities from South Africa (including seafood) also is governed by the South African Customs and Excise Act (No. 91 of 1964). The Customs and Excise Act and its regulations are enforced in part by the South African Revenue Service, Department of Customs and Excise. The Act and the



Revenue Service requirements include, among other things, the following:

      a.   Section 84(1) of the South African Customs and Excise Act which, among other things, makes it an offense knowingly to provide false statements to South African customs authorities.

      b.   A Revenue Service requirement that the contents of containers intended for export be accurately described on a "Form DA 550", titled "Bill of Entry/Export (Not Ex-Warehouse)" ("Form DA 550"), which form then is to be submitted to the Revenue Service's Department of Customs and Excise.

      19.   At certain times relevant to this Indictment, the harvesting, processing, and exportation of Patagonian toothfish also was governed by international convention. Both the United States and the Republic of South Africa were member countries of the international Commission for the Conservation of Antarctic Marine Living Resources ("CCAMLR") which, among other things, regulates the fishing, exportation and importation of Patagonian toothfish. Since at least in or about 1996, the Republic of South Africa recognized and incorporated the provisions of CCAMLR.

-12-

20.   A principal role of CCAMLR is to address illegal, unregulated and unreported fishing for Patagonian toothfish. CCAMLR has estimated that, during the period 1996 though 1999, the amount of Patagonian toothfish harvested by illegal, unregulated and unreported fishing was more than twice the catch of CCAMLR-regulated fisheries.   Such illegal, unregulated and unreported fishing has had a significant impact on the Patagonian toothfish population.   CCAMLR has determined that the rate of harvesting Patagonian toothfish is unsustainable and has resulted in a decline in the population of the species.

21.   In or about 1999, CCAMLR sought to address illegal fishing of Patagonian toothfish by, among other things, adopting a "Catch Documentation Scheme for *Dissostichus* spp." or "CDS." Among other things, the CDS is designed to monitor international trade in Patagonian toothfish, identify the origins of imports, determine if imports caught in Convention-covered areas are caught consistent with CCAMLR conservation measures and provide catch data to aid in fish-stock assessments.   The CDS became binding on all member countries (including South Africa) on May 7, 2000.

22.   Under the CDS, each vessel fishing for Patagonian toothfish is required to prepare and sign a "*Dissostichus* catch document" or "DCD" which details, among other things, the

-13-



quantities of Patagonian toothfish caught during a voyage, and the dates and areas where the fish were landed.  Copies of the DCD then must accompany the catch through all stages of preparing the catch for ultimate consumption, including during the offloading of the catch, its processing, and the exporting of the fish from, and importing to, a CCAMLR-contracting country.

23.  Under CCAMLR, any person who exports all or part of a Patagonian toothfish catch must complete the "export section" and intended import details on the DCD to account for all Patagonian toothfish in the shipment, and must certify the accuracy of the information provided.  In addition, the person exporting the Patagonian toothfish must obtain a validation of the DCD from an appropriate official of the exporting country. In South Africa, a copy of the DCD must be validated by a Marine and Coastal Management Fishery Control officer at or around the time a quantity of Patagonian toothfish is to be exported from South Africa.

### Hout Bay's Fishing Business

24.  Since at least in or about 1984, through in or about July 2001, Hout Bay was in the business of harvesting, processing and exporting South Coast rock lobster, purportedly fishing under quotas issued to Hout Bay directly or to various other companies that purportedly had assigned their quotas to



Hout Bay.  Typically, crew members of vessels that worked for Hout Bay would process the harvested South Coast rock lobster at sea, by removing and freezing the tail of harvested lobsters and discarding the remainder of the lobster.  Almost all of the frozen South Coast rock lobster tails then were packaged at Hout Bay's facilities in Cape Town, South Africa, and exported to the United States.

25.  Since at least in or about 1984, through in or about July 2001, Hout Bay also was in the business of harvesting, processing and exporting West Coast rock lobster, primarily by using quotas issued to various other individuals and entities that purportedly had assigned their quotas to Hout Bay. Beginning in or about 1988, the West Coast rock lobsters were delivered live from the fishing vessels to one or more larger carrier vessels, which then delivered the live lobster to Hout Bay's facilities in Cape Town, South Africa.  After arriving at Hout Bay's facilities, some of the West Coast rock lobster would be air-freighted live to various purchasers in Asia.  The remainder of the West Coast rock lobsters, however, were killed by Hout Bay employees, who then removed and froze the lobsters' tails.  Almost all of the frozen West Coast rock lobster tails then were placed in packages and exported to the United States

where they were marketed primarily through Icebrand and
Icebrand Maine.

26. Since at least in or about 1996, through in or
about July 2001, Hout Bay also was in the business of harvesting,
processing and exporting Patagonian toothfish, both by using its
own vessels and by purchasing Patagonian toothfish from others.
After it was harvested, some of the Patagonian toothfish was
shipped to Hout Bay's facility in Cape Town, South Africa, where
it was processed, packaged and exported.  Most of the Patagonian
toothfish harvested or purchased by Hout Bay was shipped to the
United States, where it was marketed by Icebrand and, from time
to time, processed at Icebrand Maine's facility in Portland,
Maine, and then distributed to purchasers in the United States.
Other than an experimental fishing permit covering a period in
1997, at no time relevant to this Indictment did Hout Bay or any
of the defendants have a required permit to harvest, process,
possess, sell or export Patagonian toothfish.

### Means And Methods Of The Conspiracy

27. Among the means and methods by which ARNOLD
MAURICE BENGIS, JEFFREY NOLL, GRANT BERMAN, DAVID BENGIS, and
SHAUN LEVY, the defendants, Collin Ernst Hendrik van Schalkwyk, a
co-conspirator not named as a defendant herein, and their co-



conspirators, would and did carry out the conspiracy were the following:

a.    The defendants and one or more of their co-conspirators caused Hout Bay fishing vessels and fishing vessels owned by third parties to harvest amounts of South Coast and West Coast rock lobster which far exceeded harvest amounts authorized by applicable MCM quotas.

b.    The defendants and one or more of their co-conspirators caused Hout Bay workers to offload South Coast rock lobster and West Coast rock lobster from vessels during nighttime hours, to avoid inspection and supervision of a South African fishery control officer or other authorized person.

c.    The defendants and one or more of their co-conspirators caused quantities of harvested fish to be under-reported to South African fishery control officials.

d.    The defendants and one or more of their co-conspirators caused bribes (in the form of money, fish and other benefits) to be paid to South African fishery control officers to induce them not to enforce South African regulations limiting the harvesting of West Coast and South Coast rock lobster.

e.    The defendants and one or more of their co-conspirators caused Hout Bay to export amounts of South Coast and



West Coast rock lobster which far exceeded amounts authorized by applicable export permits.

f.   The defendants and one or more of their co-conspirators caused Hout Bay to harvest or purchase quantities of Patagonian toothfish, which then were processed at Hout Bay's Cape Town facility and exported to the United States, among other places, without having the required permits to do so.

g.   The defendants and one or more of their co-conspirators caused Forms DA 550 to be submitted to the South African Revenue Service's Department of Customs and Excise. Despite requirements that containers of seafood intended for export to the United States be accurately described on the DA 550 forms, the defendants and one or more of their co-conspirators misrepresented the type and quantity of the seafood in the containers, concealing the fact that the containers included significant quantities of Patagonian toothfish, significantly more South Coast and West Coast rock lobster than was allowed in the applicable export permits, and/or over-harvested South Coast and West Coast rock lobster.

h.   The defendants and one or more of their co-conspirators deliberately did not submit to South African officials the DCD forms that under CCAMLR must accompany every shipment of Patagonian toothfish, thereby concealing from South



African authorities that they possessed, processed and exported Patagonian toothfish without a permit to do so.

      i.   The defendants and one or more of their co-conspirators imported into the United States shipments of Patagonian toothfish by presenting to United States authorities DCD forms that did not correspond to the particular shipment of toothfish being imported, thereby concealing from United States authorities that they were importing into the United States Patagonian toothfish that had been illegally harvested, possessed and processed.

      j.   The defendants and one or more of their co-conspirators caused quantities of over-harvested South Coast and West Coast rock lobster and Patagonian toothfish to be shipped to Newark, New Jersey, for distribution to New York, New York and elsewhere and caused fraudulent documentation pertaining to the seafood shipments to be sent to and from New York, New York.

      k.   The defendants and one or more of their co-conspirators caused quantities of over-harvested South Coast and West Coast rock lobster and/or Patagonian toothfish to be transported to Icebrand Maine's facility in Portland, Maine, where it was further processed and packaged for marketing in the United States.

l.   The defendants and one or more of their co-conspirators caused South African nationals who worked at Hout Bay to travel to the United States and work without proper authorization at Icebrand Maine's Portland, Maine facility, where they processed seafood imported from Hout Bay in South Africa, including over-harvested South Coast rock lobster and West Coast rock lobster and illegally imported Patagonian toothfish.

m.   The defendants and one or more of their co-conspirators caused large quantities of rock lobster to be removed from Hout Bay's storage facility in Cape Town, South Africa and hidden in a vessel, in an effort to perpetuate the scheme by avoiding detection and seizure of the rock lobster by South African authorities.

n.   The defendants and one or more of their co-conspirators caused truck-load quantities of South Coast rock lobster and West Coast rock lobster to be transported from a warehouse in Newark, New Jersey, to one or more other warehouses in Massachusetts in an effort to perpetuate the scheme by avoiding detection and seizure of the seafood by United States authorities.

o.   The defendants and one or more of their co-conspirators, in an effort to avoid detection and perpetuate the scheme, worked to alter documents indicating the quantity of



seafood harvested by fishing vessels and to destroy other

documents evidencing the actual quantities of seafood harvested.

### Statutory Allegations

28.  From at least in or about 1987, up to and

including on or about August 1, 2001, in the Southern District of

New York and elsewhere, ARNOLD MAURICE BENGIS, JEFFREY NOLL,

GRANT BERMAN, DAVID BENGIS, and SHAUN LEVY, the defendants,

Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as

a defendant herein, together with others known and unknown,

unlawfully, wilfully, and knowingly did combine, conspire,

confederate, and agree together and with each other to commit an

offense against the United States, to wit, to violate Title 16,

United States Code, Section 3372(a)(2)(A) and Title 18, United

States Code, Section 545.

29.  It was a part and an object of the conspiracy that

ARNOLD MAURICE BENGIS, JEFFREY NOLL, GRANT BERMAN, DAVID BENGIS,

and SHAUN LEVY, the defendants, Collin Ernst Hendrik van

Schalkwyk, a co-conspirator not named as a defendant herein, and

their co-conspirators, unlawfully, wilfully, and knowingly would

and did import, export, transport, sell, receive, acquire, and

purchase in interstate and foreign commerce, fish and wildlife

taken, possessed, transported, and sold in violation of foreign

law, in violation of Title 16, United States Code, Section

-21-

3372(a)(2)(A), to wit, shipments of seafood which were possessed, transported, sold and exported from South Africa in violation of the laws and regulations of the Republic of South Africa and international convention, namely,

a.   The Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1) (which makes it an offense knowingly to provide false statements to the South African customs authorities);

b.   The Marine Living Resources Act (Act No. 18 of 1998), §§ 13(1), 58(1)(a)(i) (which together make it an offense to harvest, process, or possess fish without a permit);

c.   The following regulations under the Marine Living Resources Act (Act No. 18, 1998): Ch. 5, Part 1, § 27(1)(c) (which makes it an offense to transship or transfer at sea any fish without a permit); § 27(f) (which makes it an offense to export fish from South Africa without a permit); Ch. 5, Part 8, § 44(1) (which makes it an offense to fish, collect, keep, control, store, transport or possess any rock lobster, except on authority of a permit); Ch. 5, Part 11, § 54 (which makes it an offense to fish, collect, land, sell or possess certain prohibited species (including Patagonian toothfish) without a permit); and Ch. 9, § 85(2) (which makes it an offense to transship or transfer at sea any fish or fish

-22-



products without the supervision of a fishery control officer or other authorized person); and

        d.   The Catch Documentation Scheme for *Dissostichus* spp. of the Commission for the Conservation of Antarctic Marine Living Resources.

        30.  It was further a part and an object of the conspiracy that ARNOLD MAURICE BENGIS, GRANT BERMAN, JEFFREY NOLL, DAVID BENGIS, and SHAUN LEVY, the defendants, Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as a defendant herein, and their co-conspirators unlawfully, wilfully, and knowingly would and did import and bring into the United States merchandise contrary to law, and did receive, conceal, buy, sell, and in other manner facilitate the transportation, concealment, and sale of such merchandise after importation, knowing the same to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545.

### Overt Acts

        31.  In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On numerous occasions between at least 1987 and on or about June 7, 2001, ARNOLD MAURICE BENGIS, the defendant, Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as a defendant herein, and one or more of their co-conspirators, caused fishing vessels working with Hout Bay to over-harvest South Coast rock lobster and West Coast rock lobster.

b. On numerous occasions between at least 1987 and on or about June 7, 2001, Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as a defendant herein, paid bribes to inspectors working for MCM, in order to induce those inspectors not to enforce South African fishing regulations and to allow Hout Bay to offload fish exceeding the applicable quotas.

c. On numerous occasions between at least 1987 and on or about June 7, 2001, ARNOLD MAURICE BENGIS, the defendant, and one or more of the co-conspirators caused containers that included illegally harvested South Coast rock lobster, West Coast rock lobster and/or Patagonian toothfish to be shipped from South Africa to the United States for distribution to New York and elsewhere.

d. On numerous occasions between at least 1987 and on or about June 7, 2001, JEFFREY NOLL, the defendant, while in New York, New York, arranged for the importation into the

-24-



United States of illegally harvested South Coast rock lobster,
West Coast rock lobster and Patagonian toothfish.

   e. In or about 1999 and 2000, GRANT BERMAN, the
defendant, instructed Hout Bay workers how to pack containers in
order to hide quantities of illegally harvested and exported rock
lobster.

   f. On numerous occasions in or about 2000 and
2001, GRANT BERMAN, the defendant, while in New York, New York
and elsewhere, arranged for shipments of Patagonian toothfish to
be shipped from South Africa and elsewhere to Icebrand and
Icebrand Maine in the United States.

   g. From in or about June of 2000, through in or
about December 2000, DAVID BENGIS, the defendant, arranged for
South African citizens who did not have valid working permits to
work at Icebrand Maine in Portland, Maine, and to process
illegally harvested and imported South Coast rock lobster, West
Coast rock lobster and Patagonian toothfish.

   h. On numerous occasions in or about 2000 and
2001, ARNOLD MAURICE BENGIS, JEFF NOLL, and GRANT BERMAN, the
defendants, while in New York, New York, spoke by telephone with
co-conspirators in South Africa regarding quotas, illegally-
harvested South Coast and West Coast rock lobster, and payments



that needed to be made to the fisherman of illegally harvested fish.

i.    From in or about the end of 2000 through in or about the spring of 2001, one or more co-conspirators caused the vessel Mare to harvest Patagonian toothfish on behalf of a Namibian company controlled by ARNOLD MAURICE BENGIS, the defendant, and one or more of his co-conspirators, which toothfish was to be landed in Namibia, trucked overland to Cape Town, South Africa and shipped to the United States without the required DCDs.

j.    On at least twenty occasions between on or about April 20, 2000, and May 24, 2001, one or more co-conspirators submitted export documents to MCM and South African Customs authorities in Capetown, South Africa, falsely describing the contents of shipments of seafood intended for the United States.

k.    On at least six occasions between in or about January 2001 and June 2001, SHAUN LEVY, the defendant, signed export documents which falsely described the contents of shipments of seafood to the United States and caused those documents to be submitted to South African Customs authorities.

l.    On or about June 9, 2001, DAVID BENGIS and SHAUN LEVY, the defendants, Collin Ernst Hendrik van Schalkwyk, a



co-conspirator not named as a defendant herein, and other co-conspirators, participated in a meeting at Hout Bay's facilities during which fishing records pertaining to the vessel Cape Flower were altered in an effort to conceal over-harvesting of South Coast rock lobster.

m.   On or about at June 9, 2001, GRANT BERMAN, the defendant, while in New York, New York, assisted in an effort to alter fishing records to conceal over-harvesting of South Coast rock lobster.

n.   In or about early to mid-June 2001, ARNOLD MAURICE BENGIS, the defendant, instructed Hout Bay employees to destroy records evidencing the actual amounts of seafood harvested by Hout Bay.

o.   In or about at June 2001, ARNOLD MAURICE BENGIS and JEFFREY NOLL, the defendants, instructed that a shipment of Patagonian toothfish without the required DCDs, originally intended for the United States, be diverted to Singapore and Hong Kong to avoid seizure by United States authorities.

p.   In or about late June, 2001, GRANT BERMAN, the defendant, advised ARNOLD MAURICE BENGIS, the defendant, to transfer properties to a third party in order to avoid seizure by law enforcement.

q.   Between on or about July 31, 2001 and August 1, 2001, one or more co-conspirators hired trucks to transport approximately 45,000 kilograms of rock lobster previously stored in a freezer warehouse in Newark, New Jersey, to a freezer warehouse in Massachusetts, in order to avoid seizure by United States authorities.

(Title 18, United States Code, Section 371.)

## COUNTS TWO THROUGH TWENTY-ONE

### (Violations of the Lacey Act)

The Grand Jury further charges:

32.   The allegations contained in paragraphs 1 through 27 and paragraph 31 are repeated, realleged, and incorporated as if fully set forth herein.

33.   On or about the dates set forth below, in the Southern District of New York and elsewhere, ARNOLD MAURICE BENGIS, JEFFREY NOLL, GRANT BERMAN, DAVID BENGIS, and SHAUN LEVY, the defendants, unlawfully, wilfully, and knowingly did import, export, transport, sell, receive, acquire, and purchase in interstate and foreign commerce, fish and wildlife taken, possessed, transported, and sold in violation of foreign law, to wit, the defendants, with respect to the shipments of seafood set forth below, caused to be submitted to the South African Department of Marine and Coastal Management and the Department of

-28-

Customs and Excise of the South African Revenue Service, reports that falsely and fraudulently identified the type of fish to be shipped, and caused those shipments of seafood to be possessed, transported, and sold in violation of the South African laws set forth below which, among other things, make it an offense to: (i) knowingly provide false statements to South African customs authorities (Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)); (ii) harvest, process or possess seafood without a permit (Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i); regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); and § 54); (iii) transship (that is, transfer cargo between ships) any fish or fish products from or to a vessel without the supervision of a fishery control officer or other authorized person (Regulations under the Marine Resources Act § 85(2)); and (iv) harvest, process, possess or export Patagonian toothfish without an appropriate *Dissostichus* Catch Document or "DCD" (Antarctic Treaties Act, implementing CCAMLAR's "Catch Documentation Scheme for *Dissostichus* spp."):

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| TWO | April 20, 2000 | April 24, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2) |
| THREE | April 20, 2000 | May 4, 2000 | Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| FOUR | May 3, 2000 | May 9, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| FIVE | May 26, 2000 | June 2, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| SIX | June 13, 2000 | June 20, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| SEVEN | June 22, 2000 | July 4, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| EIGHT | June 30, 2000 | July 10 and 11, 2000 | South Coast and West Coast rock lobster tails | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); and § 85(2) |
| NINE | September 9, 2000 | September 12, 2000 | South Coast and West Coast rock lobster tails, whole rock lobster and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| TEN | October 12, 2000 | October 16, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| ELEVEN | October 12, 2000 | October 28, 2000 | Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

-34-

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| TWELVE | October 23, 2000 | November 3, 2000 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| THIRTEEN | November 21, 2000 | November 27, 2000 | Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| FOURTEEN | December 12, 2000 | December 12, 2000 | Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| FIFTEEN | December 12, 2000 | December 19, 2000 | Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| SIXTEEN | January 24, 2001 | January 29, 2001 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| SEVENTEEN | February 20, 2001 | March 5, 2001 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| EIGHTEEN | March 1, 2001 | March 15, 2001 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| NINETEEN | April 11, 2001 | April 23, 2001 | South Coast and West Coast rock lobster tails, whole rock lobster and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

| COUNT | APPROX. DATE EXPORT DOCUMENTS SUBMITTED TO SOUTH AFRICA | APPROX. DATE OF ENTRY INTO UNITED STATES | ACTUAL PERTINENT SEAFOOD IN SHIPMENT | VIOLATIONS OF SOUTH AFRICAN LAW |
|---|---|---|---|---|
| TWENTY | May 14, 2001 | May 23, 2001 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |
| TWENTY-ONE | May 24, 2001 | June 5, 2001 | South Coast and West Coast rock lobster tails and Patagonian toothfish | Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1)<br><br>Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i)<br><br>Regulations under the Marine Resources Act § 27(1)(c), (f); § 44(1); § 54; and § 85(2)<br><br>CCAMLR DCD scheme, Antarctic Treaties Act |

(Title 16, United States Code, Section 3372(a)(2)(A); and
Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION AS TO COUNT ONE

The Grand Jury further charges:

34.   The allegations contained in paragraphs 1 through 27 and paragraph 31 are repeated, realleged, and incorporated as if fully set forth herein.

35.   As the result of committing the offense of conspiracy to smuggle goods into the United States, in violation of Title 18, United States Code, Section 371, as alleged in Count One of this Indictment, ARNOLD MAURICE BENGIS, JEFFREY NOLL, GRANT BERMAN, DAVID BENGIS, and SHAUN LEVY, the defendants, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the following:

a.   A sum of money equal to approximately $11,500,000 in United States currency, representing the amount of proceeds obtained as a result of the conspiracy offense for which the defendants are jointly and severally liable.

### Substitute Assets Provision

b.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants --

-40-

(i) cannot be located upon the exercise of due diligence;

(ii) has been transferred or sold to, or deposited with, a third party;

(iii) has been placed beyond the jurisdiction of the court;

(iv) has been substantially diminished in value; or

(v) has been commingled with other property which cannot be divided without difficulty; it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Section 981;
Title 28, United States Code, Section 2461;
and Title 18, United States Code, Section 371.)


_____
FOREPERSON

_____
JAMES B. COMEY
United States Attorney

-41-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

ARNOLD MAURICE BENGIS,
JEFFREY NOLL,
GRANT BERMAN,
DAVID BENGIS, and
SHAUN LEVY,

Defendants.

### INDICTMENT

S1 03 Cr. 308 (LAK)

(Title 18, United States Code,
Sections 371 and 2; Title 16,
United States Code, Section 3372(a)(2)(A).)

JAMES B. COMEY
United States Attorney.

A TRUE BILL

Foreperson.