| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK | |
| UNITED STATES OF AMERICA,<br><br>        v.<br><br>GRANT BERMAN, et al.,<br><br>                Defendants. | **DECLARATION OF DEFENDANT GRANT BERMAN IN SUPPORT OF HIS CONSENT MOTION TO WITHDRAW GUILTY PLEAS**<br><br>03 Crim. 0308 (LAK) |

GRANT BERMAN hereby declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I was born in Cape Town, South Africa, on September 26, 1969, and am a citizen of South Africa. I was educated in South Africa, and in 1992, I graduated with a Bachelor of Commerce degree from the University of Cape Town.  After college, I followed in my father's footsteps and pursued a career in accounting.  In 1995, I received a postgraduate degree in accounting from the University of South Africa, Pretoria, and am a "chartered accountant," the South African equivalent of a certified public accountant.

2.      I have known my codefendant David Bengis since grade school and we had several friends in common.  As my accounting apprenticeship was coming to an end in 1996, David Bengis mentioned to me that there was an opening at his father's company, Hout Bay Fishing Industries ("Hout Bay").  By that time, Hout Bay was a very large and successful South African fishing company, and it seemed like an excellent opportunity.

3.      I began working at Hout Bay in 1996, initially performing mostly ministerial tasks.  My responsibilities at the company changed over time, and in 1999, I was asked to transfer to the New York office of Icebrand Seafood, which was Hout Bay's sales agent.

1

I married my wife, Lorraine, in 1995, and she and I immigrated together to the United States where I continued to work for Icebrand Seafood in New York until it closed in 2001.

4. In 2002, we moved to San Diego, California, where we have lived for over a decade. Lorraine works part-time in accounting and business development. I am currently a partner at Axiom Solutions, a company involved in packaging and finishing services for the printing industry. My wife and I have three young children: Jake is thirteen, Judd is nine, and Lola is four. All three children were born in the United States and are U.S. citizens. Lorraine is a U.S. citizen as well, and I became a legal permanent resident of the United States on September 20, 2001. All of my family members, including my father, my mother-in-law, my siblings and their families, reside in the United States.

5. On August 6, 2003, Indictment S1 03 Crim. 308 (LAK) was filed against me and four others, charging us with conspiracy to violate the Lacey Act and to smuggle goods into the United States, and with substantive Lacey Act violations. I was arrested from my workplace on August 7, 2003, and released on bail two days later. Based on a referral, I retained a lawyer to represent me in connection with the charges. That lawyer was Michael Berg, a solo practitioner working in San Diego, California.

6. According to Mr. Berg, the Government had expressed an interest in meeting with me to discuss the offenses charged and the underlying circumstances, and potentially entering into a cooperation agreement whereby I would cooperate in the prosecution of the case. Mr. Berg arranged for us to go to New York to proffer with the Government. In mid-September 2003, over the course of two days, I spent several hours meeting with the Government and answering any questions the investigators asked me.

7. Shortly after those proffer sessions, Mr. Berg told me that the Government wanted me to cooperate. According to Mr. Berg, the Government insisted that I plead guilty to four felonies, even though the pending indictment only charged conspiracy and Lacey Act violations that were potentially misdemeanors. After discussing the charges and the cooperation agreement, Mr. Berg recommended that I accept the cooperation agreement. On October 2, 2003, I flew to New York from my home in San Diego, and on October 3, 2003, I pleaded guilty before a magistrate judge to a superseding information.

8. I cooperated extensively with the Government, speaking with prosecutors over the phone or meeting with them in person several times between 2003 and 2004. In 2004, I learned that, based on my cooperation and other reasons, all the other defendants pleaded guilty to charges in the indictment. To my great surprise, however, two of my codefendants, including David Bengis, were permitted to plead guilty solely to misdemeanor charges. I expected to be sentenced soon after the last of my codefendants pleaded guilty. But Mr. Berg told me that my sentencing would await the conclusion of the other defendants' cases, which he said could take some time.

9. Because I expected that my sentencing would soon occur, approximately one year after my guilty plea hearing, I contacted an immigration lawyer for guidance on what to do after my sentencing to protect my status as a lawful resident of the United States. On November 5, 2004, the immigration lawyer sent me a letter, informing me that three of the four felonies to which I pleaded guilty constituted crimes of moral turpitude and potentially were aggravated felonies. According to the attorney, if convicted of a crime of moral turpitude or an aggravated felony with a loss of more than $10,000, I would be removable from the United States and not eligible to keep my permanent residence status. Further, the immigration lawyer

3

wrote that if I were to be sentenced to a year or more in prison, I would be subject to mandatory INS custody before deportation. This was the first time that anyone had told me—or even suggested to me—that my pleas of guilty would result in my removability from the United States and loss of my permanent resident status.

10. After receiving the letter from my immigration counsel, I raised my concerns with Mr. Berg. Mr. Berg advised that we should wait for a sentencing date to be scheduled and then discuss how to rectify the situation. Based on that advice, I agreed to wait and not take immediate action.

11. From late 2004 through much of 2013, I awaited my sentencing date and provided information whenever requested of me. In those nine years, I lived with my wife and three children—two of whom were born during this time—in our home in San Diego. Over the course of those years, Mr. Berg counseled me to be patient and not seek a final conclusion of this matter. In 2013, however, after living with the charges hanging over me and weighing heavily on my family for ten years, I decided that I needed to bring them to a resolution. I contacted Mr. Berg and asked him to contact the U.S. Attorney's Office and the Court to schedule my sentencing. It was at this time that I also decided it was in my best interest to retain a new lawyer. In March 2014, I hired Patterson Belknap Webb & Tyler to represent me in this matter.

4

12. Deportation would have devastating consequences for my family and me. I have lived in the United States for fifteen years, and I have established a business and a home here. Our entire support network of friends and extended family resides in the United States. Deportation would force me to choose between being separated from my family or taking my children away from the only home they have ever known.

Dated: San Diego, California
September 17, 2014

_____
Grant Berman

5

7298145v.17298145v.1