UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/3/03

UNITED STATES OF AMERICA,

      - v. -

GRANT BERMAN,

              Defendant.

:
:
:
:
:

FILED UNDER SEAL

INFORMATION

S2 03 Crim. 308 (LAK)

------------------------------------x

## COUNT ONE

**(Conspiracy to Violate the Lacey Act
and to Commit Smuggling and Wire Fraud)**

The United States Attorney charges:

### Relevant Persons and Entities

At all times relevant to this Information:

1.   Hout Bay Fishing Industries (PTY) Ltd ("Hout Bay") was duly incorporated under the company laws of the Republic of South Africa, and its headquarters were located at East Pier, Table Bay Harbour, Cape Town, South Africa.

2.   Hout Bay was involved in the business of harvesting, purchasing, processing, marketing, selling, and exporting fish from South Africa, including, but not limited to, South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish.  South Coast rock lobster and West Coast rock lobster are species of fish native to the territorial waters of the Republic of South Africa.  South Coast rock lobster typically is

harvested by large sea-going vessels in deep ocean waters, often in areas between 24 and 60 miles from the South African coast. West Coast rock lobster typically is harvested by smaller vessels close to the shore of South Africa. Patagonian toothfish is fished by large, sea-going vessels, in deep waters distant from shore. Patagonian toothfish is commonly marketed in the United States as Chilean seabass.

3. Icebrand Seafoods, Inc. ("Icebrand"), and Associated Sea Fisheries Inc. ("Associated") were duly incorporated under the laws of the State of New York and registered to do business there. At all relevant times, Icebrand and Associated had their principal place of business in New York, New York ("the New York Office"), and were affiliated with each other and with Hout Bay.

4. Icebrand and/or Associated were involved in, among other things, the business of importing fish into the United States on behalf of Hout Bay and the marketing and distribution of those fish to purchasers in Manhattan and elsewhere. At all relevant times, Icebrand and/or Associated imported into the United States from South Africa quantities of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish shipped from Hout Bay.

-2-

5.    At certain relevant times, Icebrand Seafoods Maine Inc. ("Icebrand Maine") was duly incorporated under the laws of the State of Maine with its principal place of business in Portland, Maine ("the Maine facility").   Icebrand Maine was affiliated with Hout Bay.

6.    Icebrand Maine was involved in, among other things, processing and selling fish, including quantities of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish shipped from Hout Bay in South Africa and imported by Icebrand and/or Associated in Manhattan.

7.    Arnold Maurice Bengis ("Bengis"), a co-conspirator not named as a defendant herein, was the Managing Director and Chairman of Hout Bay.  Bengis exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, having control over Hout Bay's fishing activities and finances, and negotiating with Hout Bay's suppliers and customers and with South African regulatory authorities.  Bengis also was an executive at Icebrand.  Bengis exercised control over the affairs of Icebrand and Associated by, among other things, supervising Icebrand and Associated's personnel, having control over Icebrand and Associated's finances, and directing Icebrand and Associated's importation of fish into the United States and the marketing and distribution of those fish to Manhattan and

elsewhere within the United States. Bengis worked out of, among other places, an office at Hout Bay's facility in South Africa and an office at Icebrand and Associated's New York Office.

8. Jeffrey Noll, a co-conspirator not named as a defendant herein, was the Chairman and President of both Associated and Icebrand. At all relevant times, Noll exercised control over the affairs of Icebrand and Associated by, among other things, supervising personnel, having control over finances, and directing Icebrand and Associated's importation of fish into the United States, and the marketing and distribution of those fish to Manhattan and elsewhere within the United States. At all relevant times, Noll exercised control over the affairs of Hout Bay by, among other things, supervising personnel, having control over finances, and arranging for shipments of fish to be made from Hout Bay to the United States. At all relevant times, Noll had an office at Icebrand and Associated's office in New York, New York.

9. At all times relevant to this Information, Collin Ernst Hendrik van Schalkwyk ("Van Schalkwyk"), a co-conspirator not named as a defendant herein, was a director of Hout Bay and acted as its operational director. At all relevant times, Van Schalkwyk exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, having

-4-

control over Hout Bay's fishing activities and finances, and negotiating with Hout Bay's suppliers and customers and with South African regulatory authorities.

10. At certain times relevant to this Information, David Bengis, a co-conspirator not named as a defendant herein, was the President of Icebrand Maine. David Bengis is the son of Arnold Maurice Bengis, and exercised control over the affairs of Icebrand Maine by, among other things, supervising Icebrand Maine's personnel, having control over Icebrand Maine's finances, and negotiating with Icebrand Maine's customers. David Bengis also exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, and directing Hout Bay operations at times when Arnold Bengis was unavailable.

11. At certain times relevant to this Information, GRANT BERMAN, the defendant, served as the financial manager of Hout Bay in South Africa, and at other times relevant to this Information, was a sales manager for Icebrand and Associated in the New York Office. Berman exercised control over the affairs of Hout Bay by, among other things, supervising Hout Bay's personnel, having control over Hout Bay's finances, and negotiating with Hout Bay's suppliers and customers. Berman also exercised control over the affairs of Icebrand and Associated by, among other things, supervising Icebrand and Associated's

-5-

personnel, having control over Icebrand and Associated's
finances, and directing Icebrand and Associated's marketing and
distribution of assorted fish to Manhattan and elsewhere within
the United States. Berman worked from, among other places, an
office at Hout Bay's facility in South Africa and, at certain
other times, an office at Icebrand and Associated's New York
Office.

        12. At certain times relevant to this Information,
Shaun Levy, a co-conspirator not named as a defendant herein,
served as an employee of Hout Bay, having responsibilities
involving, among other things, exports, inventory, West Coast
rock lobster, human resources and factory production.

### Overview Of The Scheme

        13. Since at least in or about 1987, up to and
including on or about October 1, 2001, GRANT BERMAN, the
defendant, Arnold Maurice Bengis, Jeffrey Noll, David Bengis,
Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, co-
conspirators not named as defendants herein, and their co-
conspirators, engaged in an elaborate scheme to illegally harvest
or purchase large quantities of South Coast rock lobster, West
Coast rock lobster and Patagonian toothfish, export that illegal
fish from South Africa to the United States, and sell the fish in
Manhattan and elsewhere. As part of the scheme, one or more of

-6-

the co-conspirators, among other things: (i) harvested and caused others to harvest quantities of South Coast rock lobster and West Coast rock lobster far in excess of applicable quotas, (ii) illegally possessed, processed and exported to the United States large quantities of Patagonian toothfish, (iii) misreported the actual amounts of fish harvested to South African authorities, (iv) bribed South African fisheries inspectors to induce them not to enforce South African fisheries laws and regulations, (v) submitted false export documentation to South African authorities, thereby concealing their over-harvesting activities and avoiding the payment of the full amount of customs duties due, (vi) submitted false documentation to United States Customs authorities, concealing their efforts to import into the United States illegal South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish, and (vii) from time to time, processed illegally imported fish in the United States employing South African nationals who did not have proper authorization to work in the United States.

14. In or about the end of May 2001, South African authorities seized and opened a container of illegally harvested, possessed, and processed fish that GRANT BERMAN, the defendant, Arnold Maurice Bengis, Jeffrey Noll, David Bengis, Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, co-conspirators not named

-7-

as defendants herein, and their co-conspirators, were seeking to export to the United States. Following that seizure, in an effort to conceal and perpetuate the scheme, one or more of the co-conspirators engaged in a series of elaborate deceptions, designed to avoid detection and perpetuate the scheme. Among other things, BERMAN and his co-conspirators: (i) worked to alter documents indicating the actual quantity of seafood harvested by fishing vessels, (ii) destroyed or concealed documents evidencing the actual quantities of seafood harvested, (iii) sought to generate back-dated phony correspondence in an effort to disguise the illegal nature of the contents in the seized container, (iv) removed large quantities of rock lobster from Hout Bay's storage facility in Cape Town, South Africa and hid that rock lobster in a vessel, in order to avoid seizure by South African authorities, (v) moved large quantities of rock lobster from a storage warehouse in Newark, New Jersey, to Massachusetts in an effort to avoid inspection and seizure of the rock lobster by United States authorities, (vi) diverted an illegal shipment from its intended destination of New York, New York to Singapore and Hong Kong, to avoid seizure by United States authorities, and (vii) smuggled out of South Africa a large quantity of over-harvested rock lobster concealed in a

fishing vessel, which rock lobster ultimately was shipped to California, where it was sold.

## The Regulatory Background

15.  At all times relevant to this Information, the harvesting, processing, exportation from South Africa, and importation into the United States, of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish were regulated by several provisions of South African law, international convention, and United States law.

16.  At certain times relevant to this Information, the harvesting, processing, and exportation of South Coast rock lobster, West Coast rock lobster, and Patagonian toothfish were governed in part by the Marine Living Resources Act of South Africa (Act No. 18 of 1998) ("Marine Act") and the regulations promulgated under that Act.  The Marine Act and its regulations include, among other provisions, the following:

a.    Sections 13 and 58 of the Marine Act, which, among other things, make it an offense to harvest or process fish without a permit.

b.    Regulation 27(1)(c) under the Marine Act, which, among other things, makes it an offense, without authority of a permit, to transship (that is, transfer cargo between ships)

or transfer at sea any fish from a fishing vessel or person to another fishing vessel or person.

c.    Regulation 27(1)(f) under the Marine Act, which, among other things, makes it an offense to export from South Africa, any fish without a permit.

d.    Regulation 44(1)(a) under the Marine Act, which, among other things, makes it an offense to fish, collect, keep, control, store, transport or possess any rock lobster, except on authority of a permit.

e.    Regulation 54 under the Marine Act, which, among other things, makes it an offense, without a permit, to fish, collect, land, sell, or possess certain identified prohibited species. Patagonian toothfish, among other fish, is identified as one of the prohibited deepwater species.

f.    Regulation 85(2) under the Marine Act, which, among other things, makes it an offense to transship any fish or fish products from or to a vessel, without the supervision of a fishery control officer or other authorized person.

17. At all times relevant to this Information, the harvesting, processing, and exportation of South Coast rock lobster and West Coast Rock lobster were regulated in South Africa by the South African Department of Marine and Coastal Management and its various predecessor organizations

(collectively, "MCM"). MCM sought to protect the South Coast rock lobster and West Coast rock lobster species by, among other things:

a. Establishing industry-wide limits on the total quantity of South Coast rock lobster and West Coast rock lobster that may be caught during a particular fishing season.

b. Establishing quotas limiting the quantity of South Coast rock lobster and West Coast rock lobster that a quota holder (such as Hout Bay and its competitors in South Africa) would be allowed to harvest during a particular season. Under MCM practice, a quota holder from time to time was permitted to assign its quota to a second entity, which allowed the second entity to increase the total quantity of rock lobster it was allowed to catch under MCM's quota system.

c. Issuing permits to harvest South Coast rock lobster or West Coast rock lobster to the operators of particular vessels that were owned or operated by quota-owners or their assignees.

d. Observing the off-loading of South Coast rock lobster and West Coast rock lobster catches, and keeping track of quantities harvested and off-loaded by particular fishing vessels, in order to assure that the fishing companies did not

harvest more rock lobster than was permitted under applicable quotas.

e.    Issuing permits to export South Coast rock lobster and West Coast rock lobster, and keeping track of the particular quantities of rock lobster harvested, in order to assure that the fishing companies did not export more rock lobster than they (and others fishing for them) were permitted to harvest under the applicable quotas.

18.    The exportation of commodities from South Africa (including seafood) also is governed by the South African Customs and Excise Act (No. 91 of 1964). The Customs and Excise Act and its regulations are enforced in part by the South African Revenue Service, Department of Customs and Excise. The Act and the Revenue Service requirements include, among other things, the following:^

a.    Section 84(1) of Chapter X of the South African Customs and Excise Act which, among other things, makes it an offense knowingly to provide false statements to South African customs authorities.

b.    A Revenue Service requirement that the contents of containers intended for export be accurately described on a "Form DA 550", titled "Bill of Entry/Export (Not Ex-Warehouse)" ("Form DA 550"), which form then is to be

-12-

submitted to the Revenue Service's Department of Customs and Excise.

19. At certain times relevant to this Information, the harvesting, processing, and exportation of Patagonian toothfish also was governed by international convention. Both the United States and the Republic of South Africa were member countries of the international Commission for the Conservation of Antarctic Marine Living Resources ("CCAMLR") which, among other things, regulates the fishing, exportation and importation of Patagonian toothfish. Since at least in or about 1996, the Republic of South Africa recognized and incorporated the provisions of CCAMLR. The United States incorporates provisions of CCAMLR in Title 50, Code of Federal Regulations, Part 300, Subpart G.

20. A principal role of CCAMLR is to address illegal, unregulated and unreported fishing for Patagonian toothfish. CCAMLR has estimated that, during the period 1996 though 1999, the amount of Patagonian toothfish harvested by illegal, unregulated and unreported fishing was more than twice the catch of CCAMLR-regulated fisheries. Such illegal, unregulated and unreported fishing has had a significant impact on the Patagonian toothfish population. CCAMLR has determined that the rate of harvesting Patagonian toothfish is unsustainable and has resulted in a decline in the population of the species.

21. In or about 1999, CCAMLR sought to address illegal fishing of Patagonian toothfish by, among other things, adopting a "Catch Documentation Scheme for *Dissostichus* spp." or "CDS." Among other things, the CDS is designed to monitor international trade in Patagonian toothfish, identify the origins of imports, determine if imports caught in Convention-covered areas are caught consistent with CCAMLR conservation measures and provide catch data to aid in fish-stock assessments. The CDS became binding on all member countries (including South Africa) on May 7, 2000.

22. Under the CDS, each vessel fishing for Patagonian toothfish is required to prepare and sign a "*Dissostichus* catch document" or "DCD" which details, among other things, the quantities of Patagonian toothfish caught during a voyage, and the dates and areas where the fish were landed. Copies of the DCD then must accompany the catch through all stages of preparing the catch for ultimate consumption, including during the offloading of the catch, its processing, and the exporting of the fish from, and importing to, a CCAMLR-contracting country.

23. Under CCAMLR, any person who exports all or part of a Patagonian toothfish catch must complete the "export section" and intended import details on the DCD to account for all Patagonian toothfish in the shipment, and must certify the

accuracy of the information provided. In addition, the person exporting the Patagonian toothfish must obtain a validation of the DCD from an appropriate official of the exporting country. In South Africa, a copy of the DCD must be validated by a Marine and Coastal Management Fishery Control officer at or around the time a quantity of Patagonian toothfish is to be exported from South Africa.

## Hout Bay's Fishing Business

24. Since at least in or about 1984, through in or about August 2001, Hout Bay was in the business of harvesting, processing and exporting South Coast rock lobster, purportedly fishing under quotas issued to Hout Bay directly or to various other companies that purportedly had assigned their quotas to Hout Bay. Typically, crew members of vessels that worked for Hout Bay would remove and freeze the tail of harvested lobsters at sea, and then discard the remainder of the lobster. Almost all of the frozen South Coast rock lobster tails then were processed, including packaged, at Hout Bay's facilities in Cape Town, South Africa, and exported to the United States.

25. Since at least in or about 1984, through in or about August 2001, Hout Bay was in the business of purchasing, processing and exporting West Coast rock lobster, primarily by purchasing West Coast rock lobster from various individuals and

entities who were quota holders entitled to fish commercially for West Coast rock lobster. Beginning in or about 1988, most of the West Coast rock lobsters that Hout Bay purchased were delivered live from the fishing vessels to one or more larger carrier vessels, which then delivered the live lobster to Hout Bay's facilities in Cape Town, South Africa. After arriving at Hout Bay's facilities, some of the West Coast rock lobster would be air-freighted live to various purchasers in Asia. Most of the remainder of the West Coast rock lobsters, however, either died or were killed by Hout Bay employees, who then removed and froze the lobsters' tails or, from time to time, froze the lobsters whole. Almost all of the frozen West Coast rock lobster tails and frozen whole lobsters then were placed in packages and exported to the United States, where they were marketed primarily through Icebrand and Icebrand Maine.

26.  Since at least in or about 1996, through in or about July 2001, Hout Bay also was in the business of harvesting, processing and exporting Patagonian toothfish, both by using its own vessels and by purchasing Patagonian toothfish from others. After it was harvested, some of the Patagonian toothfish was shipped to Hout Bay's facility in Cape Town, South Africa, where it was processed and exported. Most of the Patagonian toothfish harvested or purchased by Hout Bay was shipped to the United

-16-

States, where it was marketed by Icebrand and, from time to time, processed at Icebrand Maine's facility in Portland, Maine, and then distributed to purchasers in the United States.  Other than an experimental fishing permit covering a period in 1997, at no time relevant to this Information did Hout Bay, BERMAN or any of the co-conspirators have a permit to harvest, process, possess, sell or export Patagonian toothfish.

### Means And Methods Of The Conspiracy

27.  Among the means and methods by which GRANT BERMAN, the defendant, Arnold Maurice Bengis, Jeffrey Noll, David Bengis, Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, co-conspirators not named as defendants herein, and others known and unknown, would and did carry out the conspiracy were the following:

a.   One or more of the co-conspirators caused Hout Bay fishing vessels and fishing vessels owned by third parties to harvest amounts of South Coast and West Coast rock lobster which far exceeded the harvest amounts reported to the MCM.

b.   One or more of the co-conspirators caused Hout Bay workers to offload South Coast rock lobster and West Coast rock lobster from vessels during nighttime hours, to avoid

-17-

inspection and supervision of a South African fishery control officer or other authorized person.

c. One or more of the co-conspirators caused quantities of harvested fish to be under-reported to South African fishery control officials.

d. One or more of the co-conspirators caused bribes (in the form of money, fish and other benefits) to be paid to South African fishery control officers to induce them not to enforce South African regulations limiting the harvesting of West Coast and South Coast rock lobster.

e. BERMAN and one or more of his co-conspirators caused Hout Bay to export amounts of South Coast and West Coast rock lobster which far exceeded amounts authorized by applicable export permits.

f. One or more of the co-conspirators caused Hout Bay and others to harvest or purchase quantities of Patagonian toothfish, which then were processed at Hout Bay's Cape Town facility and elsewhere and exported to the United States, among other places, without having the required permits to do so.

g. One or more of the co-conspirators caused Forms DA 550 to be submitted to the South African Revenue Service's Department of Customs and Excise. Despite requirements

-18-

in South Africa that containers of seafood intended for export to the United States be accurately described on the DA 550 forms, one or more of the co-conspirators misrepresented the type and quantity of the seafood in the containers, concealing the fact that the containers included significantly more South Coast and West Coast rock lobster than was allowed in the applicable export permits, and/or over-harvested South Coast and West Coast rock lobster, and/or significant quantities of Patagonian toothfish.

h.    One or more of the co-conspirators deliberately did not submit to South African officials the DCD forms that under CCAMLR must accompany every shipment of Patagonian toothfish, thereby concealing from South African authorities that they possessed, processed and exported Patagonian toothfish without a permit to do so.

i.    BERMAN and one or more of his co-conspirators caused quantities of over-harvested South Coast and West Coast rock lobster and quantities of Patagonian toothfish to be shipped to Newark, New Jersey, for distribution to New York, New York and elsewhere.

j.    BERMAN and one or more of the co-conspirators caused quantities of over-harvested South Coast and West Coast rock lobster and/or quantities of Patagonian toothfish to be transported to Icebrand Maine's facility in Portland, Maine,

where it was further processed and packaged for marketing in the United States.

           k.    BERMAN and one or more of the co-conspirators caused South African nationals who worked at Hout Bay to travel to the United States and work without proper authorization at Icebrand Maine's Portland, Maine, facility, where they re-packaged seafood imported from Hout Bay in South Africa, including over-harvested South Coast rock lobster and West Coast rock lobster and quantities of Patagonian toothfish imported from South Africa.

           l.    One or more of the co-conspirators caused large quantities of rock lobster to be removed from Hout Bay's storage facility in Cape Town, South Africa and hidden in a vessel, which rock lobster then was shipped to California, in an effort to perpetuate the scheme by avoiding detection and seizure of the rock lobster by South African authorities.

           m.    One or more of the co-conspirators caused truck-load quantities of South Coast rock lobster and West Coast rock lobster to be transported from a warehouse in Newark, New Jersey, to one or more other warehouses in Massachusetts in an effort to perpetuate the scheme by avoiding detection and seizure of the seafood by United States authorities.

n.     One or more of the co-conspirators, in an effort to avoid detection and perpetuate the scheme, worked to alter documents indicating the quantity of seafood harvested by fishing vessels and to destroy other documents evidencing the actual quantities of seafood harvested.

o.     One or more of the co-conspirators worked to generate back-dated phony correspondence in an effort conceal their over-harvesting and to avoid seizure of over-harvested fish.

### Statutory Allegations

28.     From at least in or about 1996, up to and including on or about October 1, 2001, in the Southern District of New York and elsewhere, GRANT BERMAN, the defendant, Arnold Maurice Bengis, Jeffrey Noll, David Bengis, Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, and others known and unknown, and others known and unknown, unlawfully, wilfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 16, United States Code, Section 3372(a)(2)(A), Title 18, United States Code, Section 545, and Title 18, United States Code, Section 1343.

29.     It was a part and an object of the conspiracy that GRANT BERMAN, the defendant, Arnold Maurice Bengis, Jeffrey Noll,

David Bengis, Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, co-conspirators not named as defendants herein, and others known and unknown, unlawfully, wilfully, and knowingly would and did import, export, transport, sell, receive, acquire, and purchase in interstate and foreign commerce, fish and wildlife taken, possessed, transported, and sold in violation of foreign law, in violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(1)(A) and (B), to wit, shipments of fish from South Africa to the United States having a market value in excess of $350, which seafood was taken, possessed, transported, sold, exported from South Africa, in violation of the laws and regulations of the Republic of South Africa and international convention, namely,

a. The Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1) (which makes it an offense knowingly to provide false statements to the South African customs authorities);

b. The Marine Living Resources Act (Act No. 18 of 1998), §§ 13(1), 58(1)(a)(i) (which together make it an offense to harvest, process, or possess fish without a permit);

c. The following regulations under the Marine Living Resources Act (Act No. 18, 1998): Ch. 5, Part 1, § 27(1)(c) (which makes it an offense to transship or transfer at

-22-

sea any fish without a permit); § 27(1)(f) (which makes it an offense to export fish from South Africa without a permit); Ch. 5, Part 8, § 44(1) (which makes it an offense to fish, collect, keep, control, store, transport or possess any rock lobster, except on authority of a permit); Ch. 5, Part 11, § 54 (which makes it an offense to fish, collect, land, sell or possess certain prohibited species (including Patagonian toothfish) without a permit); and Ch. 9, § 85(2) (which makes it an offense to transship or transfer at sea any fish or fish products without the supervision of a fishery control officer or other authorized person); and

     d. The Catch Documentation Scheme for *Dissostichus* spp. of the Commission for the Conservation of Antarctic Marine Living Resources, Conservation Measure 10-05 (2002) to CCAMLR (20 May 1980), TIAS 10240.

    30. It was further a part and an object of the conspiracy that GRANT BERMAN, the defendant, Arnold Maurice Bengis, Jeffrey Noll, David Bengis, Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, co-conspirators not named as defendants herein, and others known and unknown, unlawfully, wilfully, and knowingly would and did import and bring into the United States merchandise contrary to law, and did receive, conceal, buy, sell, and in other manner facilitate the

-23-

transportation, concealment, and sale of such merchandise after importation, knowing the same to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545.

31. It was further a part and an object of the conspiracy that GRANT BERMAN, the defendant, Arnold Maurice Bengis, Jeffrey Noll, David Bengis, Collin Ernst Hendrik van Schalkwyk, and Shaun Levy, co-conspirators not named as defendants herein, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, unlawfully, willfully and knowingly, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

32. In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

-24-

a. On numerous occasions between at least 1987 and on or about June 7, 2001, Arnold Maurice Bengis and Collin Ernst Hendrik van Schalkwyk, co-conspirators not named as defendants herein, and one or more of their co-conspirators, caused fishing vessels working with Hout Bay to over-harvest South Coast rock lobster and West Coast rock lobster.

b. On numerous occasions between at least 1987 and on or about June 7, 2001, Collin Ernst Hendrik van Schalkwyk, a co-conspirator not named as a defendant herein, paid bribes to inspectors working for MCM, in order to induce those inspectors not to enforce South African fishing regulations and to allow Hout Bay to offload fish exceeding applicable quotas.

c. On numerous occasions between at least 1987 and on or about June 7, 2001, one or more of the co-conspirators caused containers that included illegally harvested South Coast rock lobster and West Coast rock lobster to be shipped from South Africa to the United States for distribution to New York and elsewhere.

d. On numerous occasions between at least 1987 and on or about June 7, 2001, Jeffrey Noll, a co-conspirator not named a defendant herein, while in New York, New York, arranged through telephone calls, electronic mail and facsimile messages to South Africa for the importation into the United States of

illegally harvested, possessed, processed or exported South Coast rock lobster, West Coast rock lobster or Patagonian toothfish.

      e.    On numerous occasions in or about 2000 and 2001, GRANT BERMAN, the defendant, while in New York, New York and elsewhere, arranged through telephone calls, electronic mail and facsimile messages to South Africa and elsewhere for shipments of Patagonian toothfish to be shipped from South Africa and elsewhere to Icebrand and Icebrand Maine in the United States.

      f.    From in or about June of 2000, through in or about December 2000, GRANT BERMAN, the defendant, and Arnold Maurice Bengis and David Bengis, co-conspirators not named as defendants herein, arranged for South African citizens who did not have valid working permits to work at Icebrand Maine in Portland, Maine, and to process illegally harvested and imported South Coast rock lobster, West Coast rock lobster and Patagonian toothfish.

      g.    On numerous occasions in or about 2000 and 2001, GRANT BERMAN, the defendant, and Arnold Maurice Bengis and Jeffrey Noll, co-conspirators not named a defendants herein, while in New York, New York, spoke by telephone with co-conspirators in South Africa regarding quotas, illegally harvested South Coast and West Coast rock lobster, and payments

that needed to be made to the fishermen of illegally harvested fish.

h.    On numerous occasions in or about 2000 and 2001, GRANT BERMAN, the defendant, and Arnold Maurice Bengis and Jeffrey Noll, co-conspirators not named as defendants herein, while in New York, New York, sent and received facsimiles detailing, among other things, illegally harvested South Coast and West Coast rock lobster, and payments that needed to be made to the fishermen of illegally harvested fish.

i.    On at least twenty occasions between on or about April 20, 2000, and June 2001, one or more co-conspirators submitted export documents to MCM and South African Customs authorities in Cape Town, South Africa, falsely describing the contents of shipments of seafood intended for the United States.

j.    On or about June 9, 2001, David Bengis, Collin Ernst Hendrik van Schalkwyk and Shaun Levy, co-conspirators not named as defendants herein, and other co-conspirators, participated in a meeting at Hout Bay's facilities during which meeting fishing records pertaining to the vessel Cape Flower were altered in an effort to conceal over-harvesting of South Coast rock lobster.

k.    In or about June 2001, GRANT BERMAN, the defendant, while in New York, New York, communicated with co-

approximately 45,000 kilograms of rock lobster previously stored in a freezer warehouse in Newark, New Jersey, to a freezer warehouse in Massachusetts, in order to avoid seizure by United States authorities.

(Title 18, United States Code, Section 371.)

## COUNT TWO

### (Lacey Act)

The United States Attorney further charges:

33. The allegations contained in paragraphs 1 through 27 and paragraph 32 are repeated, realleged, and incorporated as if fully set forth herein.

34. From in or about April 2000, through in or about June 2001, GRANT BERMAN, the defendant, unlawfully, wilfully, and knowingly did import, export, transport, sell, receive, acquire, and purchase in interstate and foreign commerce, fish and wildlife with a market value in excess of $350.00 taken, possessed, transported, and sold in violation of foreign law, to wit, numerous containers including quantities of South Coast and West Coast rock lobster tails, and whole rock lobster taken, possessed, transported, sold and exported in violation of South African law, namely, South Africa's Customs and Excise Act (Act No. 91 of 1964), Ch. X, § 84(1); South Africa's Marine Living Resources Act (Act No. 18, 1998) §§ 13(1), 58(1)(a)(i); and

Regulations under South Africa's Marine Resources Act §§ 27(1)(c)
& (f), 44(1), 54 and 85(2), which containers of fish were shipped
to the United States and transported to, and sold in, Manhattan
and elsewhere.

(Title 16, United States Code, Sections 3372(a)(2)(A)
and 3373(d)(1)(A) & (B); and
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Smuggling)

The United States Attorney further charges:

35.    The allegations contained in paragraphs 1 through
27 and paragraph 32 are repeated, realleged, and incorporated as
if fully set forth herein.

36.    From in or about April 2000, through in or about
June 2001, GRANT BERMAN, the defendant, unlawfully, wilfully, and
knowingly did import and bring into the United States merchandise
contrary to law, and did receive, conceal, buy, sell, and in
other manner facilitate the transportation, concealment, and sale
of such merchandise after importation, knowing the same to have
been imported and brought into the United States contrary to law,
to wit, numerous containers including quantities of South Coast
and West Coast rock lobster tails, and whole rock lobster taken,
possessed, transported and sold in violation of law namely, the
Lacey Act, Title 16, United States Code, Sections 3372(a)(2)(A),

-30-

York, engaged in numerous telephone conversations, facsimiles, and electronic mail messages with individuals in Cape Town, South Africa, pertaining to the harvesting, purchasing, processing and exporting of over-harvested South Coast rock lobster and West Coast rock lobster and the misrepresenting to South African authorities and various cargo shippers the contents of containers of South Coast rock lobster and West Coast rock lobster, thereby depriving South Africa of natural resources and customs and tax revenue owed, and cargo shippers of fees owed for shipping containers of rock lobster to the United States.

(Title 18, United States Code, Sections 1343 & 2).

### FORFEITURE ALLEGATION

The United States Attorney further charges:

39.  The allegations contained in paragraphs 1 through 27 and paragraph 32 are repeated, realleged, and incorporated as if fully set forth herein.

40.  As the result of committing the offense of conspiracy to smuggle goods into the United States and wire fraud, in violation of Title 18, United States Code, Sections 371, 545 and 1343, as alleged in Count One of this Information, GRANT BERMAN, the defendant, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

- v -

**GRANT BERMAN,**

**Defendant.**

## INFORMATION

S2 03 Cr. 308 (LAK)

(Title 18, United States Code,
Sections 371, 545, 1343 and 2; Title 16,
United States Code, Sections 3372(a)(2)(A)
and 3373(d)(1)(A) & (B).)

_____ JAMES B. COMEY
United States Attorney.