UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

  v.

GRANT BERMAN, et al.,

                Defendants.

03 Crim. 0308 (LAK)

## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT GRANT BERMAN

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

*Counsel for Defendant Grant Berman*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND ....................................................................................................................2

    A.     Personal Life ...........................................................................................................2

    B.     Professional Life .....................................................................................................5

    C.     Testimonials to Mr. Berman's Character................................................................7

    D.     Mr. Berman's Remorse for His Misconduct..........................................................8

ARGUMENT..........................................................................................................................9

    A.     Applicable Legal Standard......................................................................................9

    B.     Mr. Berman's Substantial Cooperation with the Government..............................10

    C.     Application of the § 3553(a) Factors ...................................................................12

          1.     Nature and Circumstances of the Offense and History
               and Characteristics of the Defendant .........................................................12

          2.     The Need for the Sentence Imposed ...........................................................12

               a.     To Reflect the Seriousness of the Offense, to
                    Promote Respect for the Law, and to Provide Just
                    Punishment for the Offense .............................................................12

               b.     To Afford Adequate Deterrence to Criminal
                    Conduct ............................................................................................13

               c.     To Protect the Public from Further Crimes of the
                    Defendant.........................................................................................14

               d.     To Provide the Defendant with Needed Educational
                    or Vocational Training, Medical Care, or Other
                    Correctional Treatment in the Most Effective Manner..................14

          3.     The Kinds of Sentences Available..............................................................14

          4.     Application of the Sentencing Guidelines ..................................................14

          5.     Pertinent Policy Statements ........................................................................16

          6.     Need to Avoid Unwarranted Sentence Disparities .....................................16

          7.     Restitution....................................................................................................17

CONCLUSION.....................................................................................................................18

Defendant Grant Berman respectfully submits this Sentencing Memorandum in connection with his upcoming sentencing hearing, which is scheduled for December 18, 2014. For all the reasons stated, the Court should sentence Mr. Berman to a non-custodial sentence.

## **PRELIMINARY STATEMENT**

Grant Berman is a forty-five year-old husband and father of three. Mr. Berman is a first-time offender who has spent the past eleven years atoning for his involvement in the charged offense. He not only fully accepted responsibility for his actions, but did so very soon after being charged and provided substantial and invaluable assistance to the Government in its prosecution of others involved in the charged conspiracy. Due in large part to Mr. Berman's cooperation at that time, the Government obtained the guilty pleas of his codefendants.

This case against Mr. Berman began more than a decade ago, and during the past eleven years, he has suffered tremendously from the shame of his involvement in this matter and the uncertainty as to its conclusion. Mr. Berman's shame and profound remorse have had a devastating impact on his emotional and psychological health, leading to periods of depression and marital strain. Exacerbating Mr. Berman's and his family's suffering was the fact that his case remained unresolved, leaving them unable to plan for the future or to put this matter behind them.

The letters submitted on Mr. Berman's behalf depict a man who is honest, upright, hard-working, and selflessly devoted to his family and friends. By all accounts, Mr. Berman's involvement in the charged offense was an aberration in an otherwise law-abiding and exemplary life. Indeed, since being charged in this case, Mr. Berman has assisted prosecutors in every way that he could and has led a productive life without any legal incident. Mr. Berman has done everything in his power to make up for his serious lapse in judgment and to try to ensure

that his family is always taken care of. As demonstrated by his model behavior since 2003, there is no risk that Mr. Berman will ever commit another offense.

Title 18, United States Code, Section 3553(a) directs the Court to impose a sentence that is sufficient, but not greater than necessary to meet the goals of sentencing. Here, the Court should impose a non-custodial sentence.

## BACKGROUND

Aside from the incidents that led to his criminal conviction, Mr. Berman's life has been characterized by integrity, hard work, and devotion to his family and friends. The letters submitted on Mr. Berman's behalf reflect a man who has lived an honest and law-abiding life, and whose involvement in the charged conspiracy was an uncharacteristic and unprecedented lapse in judgment that will not be repeated. What Mr. Berman holds most dear in this world—his family—suffered tremendously over the last eleven years because of the pending charges and their future was put at risk. Mr. Berman will never again risk violating the law, hurting his family, and jeopardizing his status as a permanent resident of the United States.

A.  **Personal Life**

Mr. Berman was born in Cape Town, South Africa in 1969. In 1992, Mr. Berman graduated with a Bachelor of Commerce degree from the University of Cape Town. After college, he followed in his father's footsteps and received a post-graduate degree in 1995 in accounting from the University of South Africa, Pretoria. Mr. Berman is a "chartered accountant," the South African equivalent of a certified public accountant.

In 1995, Mr. Berman married his high school sweetheart, Lorraine ("Lulu"). (Ex. 1.) The Bermans emigrated to the United States together in 1999, living first in New York and then moving to San Diego in 2002. Mr. and Mrs. Berman have three young children, ages

thirteen, ten and five, all of whom were born in the United States.  Mrs. Berman became a United States citizen and Mr. Berman obtained his permanent resident status.

Mr. Berman's devotion to his family is a running theme in the letters submitted to the Court.  Mr. Berman's close friend Brian Vallone describes him as "the consummate family man," noting that "[e]verything he does is centered around his family, whether it's being the soccer or rugby coach for his children's teams or being a hospitable host to the large extended family that visits his home on a regular basis."  (Ex. 2.)  Another close friend, Dion Saks, describes how Mr. Berman devotes every weekend to his children, coaching their sports teams and simply spending time with them.  (Ex. 3.)  The letters describe a man entirely dedicated to his family and who has not only made a serious commitment to the extracurricular activities of his children, but who takes his role as coach and mentor to other children very seriously.  (Exs. 1-4.)

Mr. Berman's father, Aubrey Berman, notes that Mr. and Mrs. Berman are a "unifying force in our family," hosting most of the holiday meals and events for the extended family, and that the children "look up to him with respect and adoration."  (Ex. 4.)  Aubrey Berman also described the close relationship that Mr. Berman had with his late mother, who passed away in 2006 from leukemia.  (*Id.*)  Just before she passed away, Mr. Berman flew to South Africa with one of his children to visit her in the hospital.  (*Id.*)  She passed away a few days later and Mr. Berman returned to South Africa to bury her and observe shiva.  (*Id.*)  Although Mr. Berman was "devastated," his father notes that "thanks to Grant's love for [his mother], she was able to see Grant and her grandchild for the last time, just before she died."  (*Id.*)

And Mr. Berman's wife, Lulu, describes him as "an unbelievable Dad," who not only prepares his children's lunches, participates in carpool shifts and helps his children with their math homework, but who also coaches both sons' soccer teams. (Ex. 1.) She notes that "one just has to look at my daughter's adoring face when he walks in the door" to see how much she loves him. (*Id.*) Mrs. Berman writes that her husband "is the glue in the family and makes us all feel safe." (*Id.*)

Mr. Berman's devotion to family includes his extended family. Mrs. Berman describes how, when her mother came to the United States from South Africa, Mr. Berman insisted that she live with them for five months until she settled into her new home. (*Id.*) Likewise, Mr. Berman insisted that his father stay with them for six months when his father first immigrated to the United States. (*Id.*) Mr. Berman has close relationships with his in-laws and was an "unbelievable support" to his wife and her family when his wife's father passed away. (*Id.*)

Friends and family also describe the tremendous psychological and emotional toll that this case has had on Mr. Berman and his family over the last eleven years. (Exs. 1, 3, 4 & 6.) The stress of having his case unresolved for many years even put strain on the Bermans' nineteen-year marriage and, for a period between 2009 and 2012, the couple sought counseling to help deal with this significant stress on their marriage. (Ex. 5.) As the couple's therapist, Dr. Steven Solomon notes, "The shame, guilt and the deep remorse [Mr. Berman] felt over what he had done weighed on him, especially since the case was unresolved and so he was unable to address it and put it behind him." (*Id.*) The shame and anxiety from Mr. Berman's unresolved case also led to a period of depression. (*Id.*) Fortunately, Mr. and Mrs. Berman are committed

4

to their family and to one another and, thanks in part to their work with Dr. Solomon, have been able to rebuild their marriage. (*Id.*)

Nevertheless, as childhood friend Erez Chain observes, the unresolved nature of his case has put "tremendous strain" on Mr. Berman's "psyche, his family and his finances." (Ex. 6.) Mrs. Berman states that "[t]here has not been a day since August 2003 where we have not thought about" this case. (Ex. 1.) She writes:

> I saw firsthand the shame and humiliation that Grant suffered when he was arrested in his workplace and was marched out in handcuffs. I saw the pain on his face when he was forced to spend two nights in jail. I saw the remorse he felt when he chose to publicly apologize to his bosses and fellow employees. I saw the remorse he felt when he began meeting with AUSA Asner to do what he could to help rectify the situation. I have seen the stress he has endured anytime we have had to leave the country, as there were no guarantees that his visa would be granted or when he might get pulled aside at immigration control to be questioned. I see the humiliation of monthly visits and bi weekly telephone calls to Pretrial Services over the past 12 years.

(*Id.*)

Later in her letter Mrs. Berman writes, "I see Grant's remorse every day and the burden he carries trying to provide for his family. . . . We went to therapy together from 2009-2012, as the black cloud hanging over our heads with this matter unresolved, our uncertain future, and the financial stress started to take its toll. I have no resentment toward him as I know Grant is a good human being that took a wrong path and suffered for it for the past 11 years." (*Id.*)

### B. Professional Life

As Mr. Berman's accounting apprenticeship was coming to an end in 1996, David Bengis, whom Mr. Berman had known since grade school, mentioned to Mr. Berman that there was an opening at his father's company, Hout Bay Fishing Industries ("Hout Bay"). At the time,

5

Hout Bay was a very large and successful South African fishing company and it seemed like an excellent opportunity. Initially, Mr. Berman performed mostly ministerial tasks at Hout Bay. His responsibilities at the company changed over time, and he eventually became a financial manager, responsible for overhead and management of the office. In 1999, Mr. Berman transferred to the New York office of Icebrand Seafood, Hout Bay's sales agent. Mr. Berman worked at Icebrand as a financial manager until it closed in 2001.

During his time at Icebrand, Mr. Berman handled financial matters for Icebrand and interacted with Hout Bay personnel in South Africa. As he acknowledged during his plea allocution, based on his knowledge of the South African fishing business and his conversations with employees at Hout Bay, Mr. Berman should have known that a large portion of the fish and lobster processed and sold by Icebrand had been harvested and exported to the United States in violation of South African law. Mr. Berman fully understands the environmental consequences of overharvesting of fish and wildlife, and readily acknowledges his role in it while working at Icebrand. He offers no excuse for his conduct, only his commitment not to allow such a serious lapse in judgment to occur again.

In 2001, Mr. Berman decided to leave Icebrand and distance himself from Arnold and David Bengis. In 2002, he moved his family to San Diego, where they still live. Mr. Berman joined ChefWorks in 2002 as a Controller, eventually rising to become Senior VP of Sales and National Accounts. In 2010, Mr. Berman became a partner at Axiom Solutions, a company involved in packaging and finishing services for the printing industry. Mr. Berman is responsible for all client interaction and sales, and is critical to the operations of Axiom.

Colleagues, friends and family describe Mr. Berman as "hardworking," "diligent," "conscientious," and extremely "fair" to his clients, making sure not to take on any

6

projects if he is not completely confident he can meet all of his client's needs. (Ex. 3.) The letters describe a man who is "responsible" and "cautious" in both personal and professional matters. (Exs. 3 & 6.) Mr. Vallone praised Mr. Berman for his "vision and passion" for his former company ChefWorks. (Ex. 2.)

### C. Testimonials to Mr. Berman's Character

As demonstrated by the letters submitted on his behalf, Mr. Berman is a solid, caring, and generous individual, with close and lasting ties to family and friends. Mr. Chanin, who has known Mr. Berman for thirty-five years, states that he is "an honest, caring and completely upstanding citizen," who "has always represented himself and his family in a manner consistent with the highest moral standards." (Ex. 6.) Mr. Chanin recalls that "[a]s children, Grant was always my voice of reason. As teenagers, Grant would never break any rules imposed on him by his parents or our private school. . . . There was no childhood friend more diligent and conscientious about his future than Grant. Grant was always doing the right thing and while growing up alongside him, I always admired his responsible nature. I would trust Grant implicitly, with my affairs and with my own life for that matter." (*Id.*)

Mr. Vallone, a friend and former colleague, praised Mr. Berman for supporting him when he left ChefWorks for a position with a competitor, stating that Mr. Berman "put my best interests in front of his own, as he understood that this would be a good move for me and my family." (Ex. 2.) Later, Mr. Berman spent several hours helping Mr. Vallone on a "really tough account," giving him "invaluable input and countless hours," despite the fact that Mr. Berman had left the industry years before and he "had nothing to gain other than wanting [Mr. Vallone] to be successful." (*Id.*) Mr. Vallone writes of Mr. Berman:

> [H]e is a person that puts others' best interests in front of his own.
> He gives his time, his insight and his positive energy selflessly. He
> is one of those rare individuals who look for ways to help and

7

> elevate others. Grant would give you the shirt off his back if you
> needed it. He's not judgmental. He is a selfless individual who
> just wants the best for his family and friends.

(*Id.*)

Mr. Berman's wife describes him as "a very loyal friend and husband," who is "kind, genuine, smart, caring" and who "has a passion for life." (Ex. 1.) She notes that he develops close and caring relationships with friends and those who work with or for him, often going out of his way to help others whenever he can. (*Id.*) Mrs. Berman states that, despite the publicity and shame surrounding this case, Mr. Berman "did not lose a single friendship, new or old" throughout the ordeal. (*Id.*) Indeed, friends even stepped forward to help the Bermans financially when they were struggling. (*Id.*) Mrs. Berman closes by saying that, throughout this "hellish situation" she has stood by her husband's side because "he has a heart of gold and I love him and I love how he loves me and his children, and anyone would be lucky to have this man as a husband, father, brother, son or friend." (*Id.*)

The letters make clear that Mr. Berman's serious lapse in judgment was an aberration in an otherwise law-abiding and upstanding life. Friends and colleagues express surprise that the man they know "would ever intentionally violate the law" and confidence that he "would never again allow himself to be compromised" in the same manner. (Exs. 2 & 6.) Indeed, Mr. Berman had no criminal history prior to his involvement in the charged conspiracy and no run-ins with the law since that time. The letters submitted to the Court, as well as Mr. Berman's conduct since 2001 (when he left Icebrand), demonstrate that the offense to which he pleaded guilty was an uncharacteristic and unfortunate mistake that will never be repeated.

### D.    Mr. Berman's Remorse for His Misconduct

Mr. Berman is deeply remorseful and ashamed of his involvement in the charged scheme. This case has been extremely difficult for him and his family. Letters from close

8

friends and family described Mr. Berman's "tremendous remorse and regret." (Ex. 6.) Mrs. Berman writes that she sees her husband's remorse "every day." (Ex. 1.) As Dr. Solomon notes, the "shame, guilt and the deep remorse [Mr. Berman] felt over what he had done weighed on him," and led to strain in his marriage and periodic depression. (Ex. 5.)

Dr. Solomon also writes that "what most impressed [him] about Grant" was "not only his willingness to acknowledge and take responsibility for his mistakes and weaknesses, but his commitment to take whatever actions were called for to address and surmount these problems." (*Id.*) Dr. Solomon adds that he believes that "this same quality has enabled Mr. Berman to take responsibility for his criminal actions in New York and to enact relevant positive changes in his own behavior." (*Id.*) Mrs. Berman also writes of how her husband publicly apologized to his colleagues at ChefWorks after he was arrested there and how he cooperated with prosecutors in his case "to do what he could to help rectify the situation." (Ex. 1.)

Mr. Berman has accepted responsibility for his actions and eventually insisted that his previous lawyer schedule a date for sentencing, thus seeking closure and finality rather than evading the consequences of his actions. Mr. Berman holds himself to a high moral standard, and deeply regrets violating the law and the consequent shame and difficulty this has brought for his family.

## ARGUMENT

### A. Applicable Legal Standard

Pursuant to the "parsimony" clause of 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. *See United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009). The four specific purposes of sentencing identified in § 3553(a)(2) are as follows:

> [T]he need for the sentence imposed –
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). The Court must impose the least severe sentence that will serve these purposes of sentencing.

In applying § 3553(a)(2) and its parsimony clause, the Court also looks to the other § 3553(a) factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6). The Court is free to fashion a sentence that complies with the purposes of these factors and should consider the facts presented in the particular case when reaching its decision. *Rita v. United States*, 551 U.S. 338, 351 (2007); *Gall v. United States*, 552 U.S. 38, 50 (2007).

### B. Mr. Berman's Substantial Cooperation with the Government

Following Mr. Berman's arrest in August 2003, the Government promptly expressed an interest in his admitting his improper conduct and cooperating with the Government. In mid-September 2003, over the course of two days, Mr. Berman and his then-attorney, Michael Berg, spent hours meeting with the Government and answering all questions asked of him. There has never been any question regarding Mr. Berman's truthfulness or candor. Shortly after these proffer sessions, in October 2003, Mr. Berman entered into a cooperation

agreement with the Government.  As the first individual charged in the conspiracy willing or able to provide substantial information about the offense and the inner workings of Hout Bay, Mr. Berman was crucial to the prosecution of his codefendants.  Between 2003 and 2004, Mr. Berman cooperated extensively with the Government, meeting with prosecutors in person and speaking with them on the phone whenever the need arose.  In March and April of 2004, all of Mr. Berman's remaining codefendants pleaded guilty, based in large part on his substantial cooperation.  Though Mr. Berman's cooperation was largely completed by April 2004, in the ten years that have since elapsed, Mr. Berman continued to provide information and assistance to the Government whenever he was asked.

Earlier this year, with the consent of the Government, Mr. Berman successfully moved to withdraw his previously-entered pleas to charges filed in a superseding information and pleaded guilty to a conspiracy charge that was contained in the indictment on which he was originally arrested.  The Government consented to the withdrawal, but it informed Mr. Berman that his withdrawal of his pleas would relieve the Government of its commitment to file a motion, pursuant to U.S.S.G. § 5K1.1, for a downward departure on his behalf.  Mr. Berman agreed that his cooperation agreement required that he plead guilty to the charges in the superseding information, and does not challenge the Government's decision not to file a § 5K1.1 motion.  To the contrary, he appreciates the Government's consent to his withdrawal of the pleas based on the unique circumstances of his case.  Nonetheless, his almost-immediate willingness to acknowledge his wrongdoing and his substantial cooperation with the Government are facts bearing consideration in determining an appropriate sentence, even in the absence of a § 5K1.1 motion.

C. **Application of the § 3553(a) Factors**

Application of the factors set forth in § 3553(a) further warrants that the Court impose a non-custodial sentence on Mr. Berman under the circumstances of the case.

1. **Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

Mr. Berman accepts full responsibility for his involvement in the charged conspiracy to which he pleaded guilty. The Lacey Act addresses serious and important crimes; the charged conduct did not, however, involve violence or direct financial consequence to other persons. There is also no dispute that Mr. Berman did not devise the unlawful schemes or play a leadership role in the charged conspiracy. Instead, he took direction from superiors who were far more knowledgeable about and responsible for the offenses charged.

Furthermore, Mr. Berman has no prior criminal history and has led a completely law-abiding and productive life before the offense and in the eleven years since he was charged. Due to the unusually long period of time between his arrest and his sentencing, the Court has had the opportunity to confirm that Mr. Berman is capable of and intent on living the rest of his life in strict compliance with all applicable laws. It is not that Mr. Berman has turned his life around; rather, the charged conduct represents an aberration in an otherwise completely law-abiding life and career.

2. **The Need for the Sentence Imposed---**

   a. **To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A non-custodial sentence will adequately reflect the seriousness of Mr. Berman's offense, promote respect for the law and provide more than just punishment for his offense. In this respect, it is worth noting that Mr. Berman has already paid a steep price for his conduct.

The letters from his friends, family and therapist detail the serious psychological and emotional distress Mr. Berman has suffered as a result of this case and its lack of resolution over the last eleven years. His codefendants served their sentences and wrapped up their cases years ago. For Mr. Berman, however, his saga has continued. The lack of resolution has made it more difficult for him to obtain employment commensurate with his education and skills, and the legal expenses associated with this case have placed a significant financial stress on Mr. Berman and his family.

### b. To Afford Adequate Deterrence to Criminal Conduct

Mr. Berman will never again commit a criminal offense. By all accounts, Mr. Berman's involvement in the charged offense was an aberration in an otherwise exemplary and law-abiding life. Indeed, in the eleven years since Mr. Berman was charged, he has been under supervision by an assigned Pretrial Services officer in San Diego. During the last decade, he has been an upstanding and productive member of society, and has had no run-ins with the law. And even if deterrence were necessary, Mr. Berman's prolonged experience in this case is more than adequate to deter him from ever committing another offense.

Furthermore, general deterrence has already been established, without the need to further punish Mr. Berman with a custodial sentence. Mr. Berman's codefendants have all pleaded guilty and those most responsible for the charged conspiracy have received prison sentences. The case has also garnered considerable media attention in the United States and South Africa, to the embarrassment of Mr. Berman and his family. No further deterrence would be gained from sentencing Mr. Berman to a period of incarceration.

13

### c. To Protect the Public from Further Crimes of the Defendant

Before the offense and in the eleven years since charges were brought, Mr. Berman has not committed any crime. His exemplary behavior before and after the charged offense is evidence that this conduct represented an anomaly and a lapse in judgment that will never happen again. Mr. Berman's behavior over the last decade demonstrates better than any promise he could make that there is no risk that he will commit another crime.

### d. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

This factor is not relevant to the determination of an appropriate sentence for Mr. Berman.

### 3. The Kinds of Sentences Available

The Court has discretion to impose a non-custodial sentence. Such a sentence is the most appropriate result in this case given Mr. Berman's acceptance of responsibility, his work with the Government to assist in the prosecution of others, the relatively minor role he played in the charged conspiracy, the length of time that has elapsed since his original guilty plea, and his exemplary behavior before and since his involvement in the charged offense.

### 4. Application of the Sentencing Guidelines

We respectfully submit that the Sentencing Guidelines should have little or no impact on the sentence imposed in this case because the Guidelines fail to account for the substantial punishment that Mr. Berman effectively has received over the last eleven years. But Mr. Berman understands that a Guidelines' calculation must be done, and there is no dispute as to the calculation.

Pursuant to the September 24, 2014 plea agreement, the November 1, 2000 edition of the Sentencing Guidelines applies to this case. The Guidelines' calculation is as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2Q2.1) | 6 |
| Offense Involved Pecuniary Gain | +2 |
| Est. Market Value of Fish: $800,000-$1.5 million | +11 |
| Acceptance of Responsibility: | -3 |
| Total: | 16 |

In Criminal History Category I, this results in a Guidelines range of 21-27 months. Because Mr. Berman pleaded guilty to a misdemeanor offense, however, the maximum punishment is 12 months' imprisonment.

The main problem with the Guidelines calculation is that it fails to take into account the emotional toll that the case has had on Mr. Berman since 2003 and that he has effectively been on probation for more than a decade. As described above, the uncertainty as to how the case would be resolved, including its possible effect on Mr. Berman's immigration status, has weighed on him and his family for years. Moreover, after his arrest and two nights in custody, Mr. Berman was released on bail under Pretrial supervision. That supervision has continued for the last eleven years, with regular reporting requirements and approvals needed for Mr. Berman to travel. Though the terms of Pretrial supervision are far less onerous than incarceration, it was much the same as a decade-long probationary term.

Furthermore, although Mr. Berman no longer has the benefit of a Government motion for a downward departure under U.S.S.G § 5K1.1 (due to the withdrawal of Mr. Berman's original guilty pleas), there is no dispute that he provided substantial cooperation to the prosecutors in this case pursuant to his original cooperation agreement and was a major factor in the Government's ability to obtain the convictions of his codefendants. Mr. Berman is

not asking for a downward departure; however, a sentence outside the stipulated Guidelines' range is appropriate based in part on his substantial cooperation.

For these reasons, Mr. Berman respectfully submits that a sentence outside of the Guidelines' range—indeed, a non-custodial sentence—is warranted in this case.

### 5. Pertinent Policy Statements

Under U.S.S.G. § 5K2.0(A)(2)(B), a departure from the Sentencing Guidelines may be warranted where "there is present a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." As previously discussed, the Guidelines calculation in this case does not take into account the eleven years during which Mr. Berman lived under Pretrial supervision and suffered from the emotional and psychological distress of not knowing when and how his case would be resolved. The extraordinarily prolonged uncertainty surrounding Mr. Berman's legal situation and his family's ability to remain in the U.S. has been sufficient punishment for Mr. Berman, and warrants a sentence of time served.

### 6. Need to Avoid Unwarranted Sentence Disparities

The sentences imposed by this Court on other members of the conspiracy further support the imposition of a non-custodial sentence. David Bengis, who played a far more significant role in the charged conspiracy and who did not provide assistance to the Government, pleaded guilty to a misdemeanor and received a 12-month custodial sentence. (*United States v. Bengis*, 03-cr-208, Dkt. No. 84.) David Bengis completed that sentence and his one-year term of supervised release years ago.

Mr. Berman's relatively minor role in the charged conspiracy is more comparable to that of Shaun Levy, who played a lesser role in the offense and also cooperated with the Government. Mr. Levy received a sentence of time served (1 day) and a $6,000 fine. (*United*

16

*States v. Levy*, 03-cr-308-001 (LAK), Dkt. No. 93.) In light of Mr. Berman's lesser role in the conspiracy, his assistance to prosecutors in obtaining the convictions of his codefendants, and the passage of time since the offense charged, Mr. Berman should receive a non-custodial sentence, or like Mr. Levy, a sentence of time served. Considering that Mr. Berman has been subject to Pretrial supervision for the last eleven years without incident, he submits that no further probationary term is necessary.

### 7. Restitution

When Mr. Levy was sentenced on September 21, 2004, the Court exercised its discretion pursuant to 18 U.S.C. § 3664(h) to order him to pay restitution in the amount of $10. Under § 3664(h), a court may "make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The Court ordered that Mr. Levy was "jointly and severally liable for such restitution as I require Arnold Bengis to make, to the extent of the first $10, and not thereafter." (9/21/04 Sent. Tr. at 8-9, *United States v. Levy*, 03 Cr. 308-001 (LAK), Dkt. No. 93). The Government raised no objection to the request for apportionment of liability to Mr. Levy in that amount. (*Id.* (agreeing that defense counsel correctly stated the law and raising no objection).)

A similar restitution order should be entered with respect to Mr. Berman. Mr. Berman's culpability for the charged offense is most similar to that of Mr. Levy. Further, the case and defense costs have been a tremendous financial drain on Mr. Berman over the years. His financial standing does not permit him to make a substantial restitution payment along the lines that Arnold Bengis was ordered to make. Mr. Berman is and has always been working, but he has never had the financial resources of Arnold or David Bengis, and realistically will never have anywhere close to their resources. An order making Mr. Berman jointly and severally

17

liable for restitution in this case up to $10 (or some relatively insubstantial amount), which undoubtedly has already been paid, is appropriate under the circumstances here.

## **CONCLUSION**

For the past eleven years, Mr. Berman has been paying the price for the serious mistakes he made while working at Hout Bay and Icebrand. After the charges were brought, he immediately accepted responsibility for his actions, provided truthful and substantial assistance to the Government, and has led an exemplary and law-abiding life. Mr. Berman respectfully submits that it is now time to finally close this long-lasting case and this painful chapter in his life. We urge the Court to impose a non-custodial sentence or sentence of time served.

Dated: New York, New York
December 4, 2014

Respectfully submitted,

By: /s/ Daniel S. Ruzumna_____
Daniel S. Ruzumna
Elena Steiger Reich
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
druzumna@pbwt.com
esteigerreich@pbwt.com
(T) 212 336-2000
(F) 212-336-1205

*Counsel for Defendant Grant Berman*